[No. F014788. Fifth Dist. May 13, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES STANLEY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

COUNSEL

Richard C. Camino, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, W. Scott Thorpe and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**THAXTER, J.**—Appellant Michael James Stanley was convicted, after jury trial, on a single count of forcible rape (Pen.[1] Code, former § 261, subd. (2)), a felony, and of unauthorized entry of a dwelling (§ 602.5), a misdemeanor, as a lesser offense of a second charge, burglary. The jury also found, in a bifurcated proceeding, that Stanley was released on bail and on his own recognizance at the time of the rape and unauthorized entry within the meaning of section 12022.1. The court sentenced Stanley to a prison term of eight years on the rape conviction and enhanced the sentence by two years under section 12022.1. The court imposed a sentence of six months in jail on the unauthorized entry conviction but ordered that term discharged, as Stanley had already served more than six months in jail.

On appeal, Stanley's principal claim of error is that the court erroneously precluded him from asking questions of the victim's roommate designed to elicit testimony about Stanley's prior relationship with the roommate. He claims the evidence would have supported a "reasonable belief in consent" defense recognized in *People* v. *Mayberry* (1975) 15 Cal.3d 143 [125

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

Cal.Rptr. 745, 542 P.2d 1337]. He also attacks the court's denial of his section 1118.1 motion in the bifurcated enhancement trial. Finally, Stanley urges two sentencing errors. We affirm.

FACTS

On December 27, 1989, Stanley and three friends shot pool at a lodge near Sonora from about 6 p.m. until 8:30 or 9. During that time they consumed about 10 beers among them. They then returned to Sonora and parted company. Stanley and one of the group, Joe Decker, left in Decker's car. They parked off the road for about an hour, listened to music, and consumed the final two cans of a twelve-pack of beer.

Decker and Stanley then drove to 310 Yaney Street, arriving around 11:30 p.m. The house was occupied by three young women, Michelle, Janene, and C.W. Decker was a longtime acquaintance of Janene and Michelle, but did not know C.W. (a comparative latecomer to the house on Yaney) well. According to the witnesses, Stanley did not know Janene or Michelle well and did not know C.W. at all.

The house at 310 Yaney is set back from the street with a narrow drive leading to the front of the house. Decker parked on the street and walked a few feet up the driveway; he noted that Janene's car was not in the driveway, and the house was quiet and dark except for a glow that he took to be a television set. Decker told Stanley it appeared everyone was asleep and he did not want to bother them. Stanley replied that he wanted to talk to them. Decker then got back into his car and once again told Stanley to get in: "I'm leaving. If you want a ride, you know, come on, let's go." After waiting a moment, Decker drove off, leaving Stanley in the driveway facing the house.

Janene had left her job about 10:30, after which the three women exchanged Christmas gifts at their residence. About 11:45, Janene and Michelle left in Janene's car to go to the grocery store. C.W. was just getting into bed on a futon in the living room as they left. They did not lock the front door.

When C.W. fell asleep, the only lights illuminated were the front porch lamp and some Christmas tree lights. She awoke in darkness; the Christmas tree lights were off. What woke her was someone patting the foot of her bed. She sat up and asked who it was, but there was no answer. She saw a figure at the foot of the bed, and she again asked who was there. Someone grabbed her and pushed her back onto the futon. She asked what he wanted, and he said, "Money." She asked again, and he responded, "You fucked my brother." She struggled, despite his statement that he had a gun. As she continued to fight, he shoved her head down onto the futon.

C.W.'s assailant pulled off her sweat pants and panties as she continued to struggle. The two fell off the futon onto the floor, with the assailant on top. C.W. was yelling, and he told her to shut up several times, threatened to use a knife on her, struck her across the jaw, and finally gagged her with a bandanna. She continued to attempt to yell through the gag. While the assailant gripped both her wrists in one hand, he digitally penetrated, then raped her. C.W. asked where her roommates were, and he replied, "What roommates?"

After the rape was complete, the man threw a blanket over C.W.'s head and left through the front door. She put her panties and sweat pants on and went to the window, but she could see nothing.

Meanwhile, Janene and Michelle completed their shopping and were returning to the car when Joe Decker, cutting through the parking lot, saw them and pulled up. Decker told Janene and Michelle that he had left Stanley at their house, then drove off.

After stopping to buy gas and taking a roundabout route, Janene and Michelle drove home. When they arrived, they both noticed the porch light was off. As she got out of the car, Janene could hear C.W. screaming or sobbing. Once inside the house, Janene and Michelle were told by C.W. that she had been raped, and she did not know who had done it. Janene called the police.

Within several minutes Police Sergeant Tonegato arrived, spoke with the women, and advised C.W.'s roommates to get her to the hospital for an examination. At Tuolumne General Hospital, C.W. was examined by Dr. Waldman. C.W. described the assault to Waldman. Waldman noted sharply defined reddened areas on C.W.'s back and wrists. She reported tenderness in the posterior vaginal area. Waldman performed a pelvic exam, during which he noted and took samples of seminal fluid containing sperm.

Waldman concluded that the results of the examination were consistent with C.W.'s description of the attack and inconsistent with an episode of consensual sex.

At the house, a police officer found a blue bandanna on the futon. In the bedding he also found a watch, missing one of the springbars which hold the strap to the body of the watch. The bandanna had apparently been removed from the bathroom. Joe Decker and Stanley's father both testified the watch appeared to be Stanley's.

Inspection of the rest of the house revealed several other items of note. One of C.W.'s brassieres had been placed on Michelle's bed. Some of

Janene's exercise clothing had been removed from a drawer and put on her bed. A pillowcase had been removed from Michelle's bed and was found on the futon. Human feces were observed in the toilet. Nothing appeared to be missing.

Stanley turned himself in the next day and voluntarily submitted to a blood test.

A criminalist with the Department of Justice testified that only about 5 percent of the male population, a group that included Stanley, could have been the source of the semen collected by Dr. Waldman. He also tested the bandanna, revealing amylase on "many parts" of the bandanna; amylase is indicative of saliva, suggesting the bandanna had been in someone's mouth. Typing indicated the source was a "secretor" with type A-B blood; this description fit C.W. and did not fit Stanley. C.W. denied ever having used the bandanna as a towel, washcloth or hairband.

## DISCUSSION

I. *The court did not err in excluding offered evidence that, a month prior to the rape, Stanley and Janene engaged in consensual sex.*

Defense counsel called as his final witness Janene, C.W.'s roommate. His first question to her: "In late November of last year [i.e., a month before the incident], did you have sexual intercourse with Mike Stanley?" The court sustained the prosecution's immediate relevance objection. After the jury was excused, the relevance of the proffered evidence was briefly debated. The court refused to change its ruling. Defense counsel then revealed another question he intended to ask of Janene, and the court again ruled against the defense, this time relying on Evidence Code section 352. Defense counsel then made offers of what he expected to prove by asking the two questions. After restating that the objection was sustained, the court admonished the jury to disregard the question.

Relying on *People* v. *Mayberry, supra,* 15 Cal.3d 143, Stanley complains on appeal that the court abused its discretion in excluding the evidence of prior consensual intercourse between Stanley and Janene.

In *Mayberry,* the Supreme Court held that "[i]f a defendant entertains a reasonable and bona fide belief that a prosecutrix voluntarily consented to accompany him and to engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite under Penal Code section 20 to a conviction of . . . rape by means of force or threat . . . ."

(15 Cal.3d at p. 155.) The Supreme Court found that the lower court had prejudicially erred in refusing to give an instruction to that effect. (*Id.* at p. 158.)

*Mayberry* has been the subject of considerable interpretation in the Courts of Appeal. In some of these cases, the evidence offered to establish reasonable belief in consent was of prior consensual sexual activity between the defendant and victim. Such a case was *People* v. *Simmons* (1989) 213 Cal.App.3d 573 [261 Cal.Rptr. 760]. There, the court held that no instruction on reasonable belief in consent was required when the *only* evidence of such belief was the prior sexual contact:

"We conclude that evidence of the victim's prior sexual conduct with a defendant, *by itself*, is insufficient to require that the jury be instructed pursuant to CALJIC No. 10.23, because such conduct has no tendency to prove or disprove the defendant's state of mind at the time of the offense. To warrant this instruction, there must be evidence, whether direct or circumstantial, of the defendant's state of mind at the time the offense was committed. In such a case, the additional evidence that the victim and the defendant previously had engaged in sexual intercourse might properly have a bearing on the reasonableness of the defendant's belief." (213 Cal.App.3d at pp. 580-581, italics in original.)

This case differs from *Simmons* factually in that here the proffered evidence was not of prior sexual relations between the defendant and the victim, but of such relations between the defendant and the victim's *roommate*. Stanley argues that the evidence was nonetheless relevant to his intent, claiming that he mistook C.W. for Janene.

Stanley suggests the jury could have concluded that he, "in a drunken stupor, reasonably believed in good faith that he was having intercourse with Janene." In fact, he so argued below, even though he was not able to question Janene about the incident.

The argument is badly flawed. The only evidence of intoxication was Joe Decker's testimony that four friends bought a twelve-pack of beer sometime prior to 6 p.m., that Decker himself drank four of the beers, and that he saw Stanley consume at least one. Even were we to assume that Stanley was drunk, however, voluntary intoxication cannot be used to support a *Mayberry* defense. (See *People* v. *Bishop* (1982) 132 Cal.App.3d 717, 722 [183 Cal.Rptr. 414]; *People* v. *Guthreau* (1980) 102 Cal.App.3d 436, 443 [162 Cal.Rptr. 376]; *People* v. *Potter* (1978) 77 Cal.App.3d 45, 51 [143 Cal.Rptr. 379].) Finally, nothing in the record indicates that Stanley did, in fact,

mistake C.W. for Janene. He did not call the victim "Janene," and there is no evidence that C.W. and Janene were similar in size, appearance, or body type. His mistaken identity argument is based purely on speculation.

Stanley's contention suffers from an even more fundamental defect. Even if the jury could reasonably find that Stanley believed the person he encountered on the futon was Janene, there is absolutely no evidence supporting a reasonable, good-faith belief by him that she consented to an act of intercourse. C.W.'s testimony was unequivocal and undisputed: C.W. screamed, yelled and resisted, while Stanley (whom she did not know) struck her, threatened to use weapons on her, forcibly removed her clothing, held her down, gagged her, and raped her. Nothing in this record could reasonably be taken as direct or circumstantial evidence that Stanley believed, reasonably or otherwise, that C.W. (even if he believed her to be Janene) was consenting to the conduct.

■   Although *People* v. *Simmons, supra,* 213 Cal.App.3d 573, dealt with an instruction issue rather than admissibility of evidence, we agree with that court's statement that evidence of prior consensual sexual conduct is relevant only to buttress other evidence of the defendant's state of mind. (*Id.* at pp. 580-581.)   ■   Because there was no other evidence, direct or circumstantial, showing that Stanley believed C.W. consented to intercourse, any prior relationship he had with Janene was irrelevant. The court's ruling was correct.

■   Stanley further argues that the objection was sustained based on Evidence Code section 352 and that the court erred in failing to do an on-the-record weighing of probative value versus prejudice. Stanley has misread the record. It shows the following:

"Q.   [MR. MAROVICH:]   The incident that Mike Stanley was arrested over occurred on December 27 and 28 of last year, 1989. In late November of last year, did you have sexual intercourse with Mike Stanley?

"MR. BOYACK:   I object to that, Your Honor. *It is clearly irrelevant.*

"THE COURT:   *Sustained.*

"MR. MAROVICH:   *I think it is relevant,* and I would like to make an offer of proof.

"THE COURT:   I have already ruled on it. You can argue outside the presence of the jury.

"Mr. Marovich:   Pardon me?

"The Court:   If you want to argue about it outside of the presence of the jury, but *I have ruled on it as irrelevant.*" (Italics added.)

After both defense counsel and the prosecutor had set forth their arguments on relevance, the court stated: "The objection has previously been ruled and sustained. I am going to continue sustaining the objection." No mention of Evidence Code section 352 was made up to this point.

Defense counsel then related another question he intended to ask Janene.

"Mr. Marovich:   There are some other questions. The witness gave a written statement to Mr. Tonegato that she had partied with Mike and Joe Decker the Wednesday before Thanksgiving and stayed at Mike's house, and I intend to ask her if, in fact, she was friends with Mike and had partied before Thanksgiving with him and Joe Decker at Mike's house. *I think it goes again to the intent [to enter the house].*" (Italic; added.)

The prosecutor objected to this question as well. The court indicated that if the question were allowed, the answer would be "limited to the burglary only. If you do that, there would have to be a limiting instruction, . . ." After further argument the court ruled: "I am going tc sustain the objection again. It is going to get into confusing limits on [Evidence Code section] 352. I am excluding on that basis."

The court's reliance on Evidence Code section 352 was clearly limited to the second proposed question, not the one dealing with sexual relations between Stanley and Janene. Stanley does not claim that the ruling on the second question was error. Even if we stretched his argument to include that ruling, any error was clearly harmless. Stanley's trial counsel did elicit from Janene testimony that she and Stanley had "partied" in the past and argued, with success, that when he entered the house Stanley did not have the intent to steal. Having prevailed on the very issue as to which he offered the excluded evidence, Stanley was not prejudiced by the court's ruling.

II.   *Section 654 was not violated.*

■   Stanley next contends that he could not properly be separately punished for both unauthorized entry and rape. He relies on section 654: "An act or omission which is made punishable in different ways by different

provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

Stanley relies on *People* v. *Booth* (1988) 201 Cal.App.3d 1499 [248 Cal.Rptr. 64] as controlling. There, the defendant was charged with multiple burglaries and rapes (along with assorted other charges), and pleaded guilty. On appeal he contended that section 654 required the burglary terms be stayed, arguing " 'there is no evidence [defendant] entered the residences with the intent to do anything other than sexually assault the victims.' " (201 Cal.App.3d at p. 1502.) The appellate court rejected the contention, noting that the record supported a dual intent to both steal from and sexually assault his victims.

Stanley here contends that the *only* intent supported by the record is to have intercourse. "Here, there was no conviction of larceny or, indeed, burglary, to support the court's implicit conclusion that Appellant entertained dual objectives when entering the residence and manifestly no evidence that he formulated an intent to commit a theft after raping the victim." "[N]o evidence was introduced that Appellant had entered the residence for a purpose other than to engage in sexual intercourse."

We are not persuaded. First, unlike *Booth*, here there was no burglary conviction. The unauthorized entry conviction required no finding of larcenous or felonious intent. (See *People* v. *Muis* (1980) 102 Cal.App.3d 206, 213 [163 Cal.Rptr. 791], disapproved on other grounds in *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 372 [173 Cal.Rptr. 453, 627 P.2d 183].) Evidence supported a conclusion that Stanley's initial entry was made for a completely innocuous purpose, such as talking to the residents or using the bathroom.

If, as argued both below and on appeal, Stanley's entry was for consensual sex with Janene, his intent clearly changed when he forced himself on the victim and overcame her resistance. Stanley's argument seems to equate an intent for consensual intercourse with an intent to rape. We flatly reject any such suggestion.

The court was not precluded from sentencing Stanley on both counts.

III., IV.*

* * * * * * * * * * * * * * * * * * * * * * * * *

## DISPOSITION

The judgment is affirmed.

Best, P. J., and Stone (W. A.), J., concurred.